IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAWN WHIRL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Former CPD detective JAMES PIENTA; | ) |
| former CPD detective WILLIAM MARLEY; | ) |
| and the CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | )   Jury Demand |

## COMPLAINT

Plaintiff SHAWN WHIRL, for his complaint against former Chicago Police Detective JAMES PIENTA; former Chicago Police Detective William Marley; and the CITY OF CHICAGO alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff Shawn Whirl spent 24 years in prison because he was wrongfully convicted of a murder that he did not commit. Plaintiff was charged with that crime because he was physically tortured and abused by Area 2 detective James Pienta into giving a false confession, which was the central piece of evidence against him and compelled him to plead guilty.

1

2.      James Pienta is now known to be one of a clandestine group of Area 2 detectives who worked with, and later under the command and supervision of, former Chicago Police Commander Jon Burge, to systematically torture African American suspects during interrogations. The miscarriage of justice in Plaintiff's case was part of a pattern of systemic torture and physical abuse of African American suspects at Area 2 and, later, at Area 3 police headquarters. Plaintiff's torture, wrongful prosecution and false imprisonment occurred and continued because command personnel in the Chicago Police Department, successive Superintendents of Police and several Mayors of the City of Chicago, most notably former Mayor Richard M. Daley, all concealed and suppressed their knowledge of ongoing torture and physical abuse under Burge, blocked and undercut all efforts to expose, discipline, and prosecute offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional  misconduct.

3.      Plaintiff seeks damages for the grievous injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## II.      JURISDICTION AND VENUE

4.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 *et seq.*; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5.      This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein

occurred here as well.

## III.    PARTIES

6.      Plaintiff Shawn Whirl is an African-American man, and a citizen of the United States.

7.      Defendant James Pienta was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality himself, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

8.      Defendant William Marley was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

9.      Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and his City Council, the Corporation Counsel's Office, and the Chicago Police Board.  The City of Chicago is and/or was the employer of each of the Defendant Officers. The City of Chicago is responsible for the acts of the Defendant Officers while employed by the City of Chicago and while acting within the scope of their employment.

3

10.     At all times relevant to this action, each of the named Defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois. The individual Defendants' actions constituted "state action" as defined under federal law.

### Unsued Co-Conspirators

11.     From 1981 to 1989 unsued co-conspirator Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office. From 1989 to 2011, Daley was the Mayor of the City of Chicago and as such was a chief policymaker for the City of Chicago, its Police Department, City Council, and Police Board and was and is therefore responsible for the policies, practices, and customs complained of herein.

12.     Unsued co-conspirator Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to August of 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division by Superintendent Leroy Martin and held this assignment until November of 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to, Defendant Pienta and other Area 2 detectives named herein. Burge, who was the longtime supervising Lieutenant of Defendant Pienta, was, on June 28, 2010, convicted of perjury and obstruction of justice for

falsely denying that he participated in, was aware of, and supervised police torture.

13.     Unsued co-conspirator John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to August of 1986, and supervisor of the Unit's notorious midnight shift, also known as the 'A Team," who also worked on the midnight shift of the Area 2 Violent Crimes Unit. Byrne, like Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including, but not limited to, Defendant Pienta.

14.     In 1983 and early 1984 , unsued co-conspirator Leroy Martin was the Commander of Area 2 and Jon Burge's direct supervisor, and from 1987 to 1992, he was the Superintendent of Police for the City of Chicago, and as Superintendent was responsible for the policies, practices, and customs complained of herein.

15.     From 1990 to 1998, unsued co-conspirator Gayle Shines was the Director of the Office of Professional Standards of the Chicago Police Department, appointed by Mayor Richard M. Daley. As such, she implemented the policies, practices and customs of the CPD with regard to discipline. Her direct supervisor was the Chicago Police Superintendent.

16.     From 1998 to 2004, unsued co-conspirator Terry Hillard was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein.

17.     From 1998 to 2002, unsued co-conspirator Thomas Needham was counsel to, and administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor, and, as

such, implemented the policies, practices and customs alleged herein.

## IV.    FACTUAL ALLEGATIONS

### Plaintiff Whirl's Arrest, Interrogation, Torture, and Wrongful Conviction

18.    On April 18, 1990 at around 10:00 p.m., the body of taxicab driver Billy Williams was found in his taxicab at 820 E. 103rd Street in Chicago.  The cause of death was a gunshot wound to the head.

19.    On April 20, 1990, after learning that the police were attempting to contact him, Plaintiff called Area 2 police headquarters.  At approximately 12:30 p.m., while Plaintiff was speaking to Area 2 detective John Duffy on the phone, he was arrested by Chicago Police officers and taken to Area 2 for questioning.

20.    Plaintiff was then taken to an interview room and questioned by Area 2 detectives Duffy and James Dwyer about his whereabouts over the previous two days.  Plaintiff answered their questions truthfully and denied being involved in the murder.

21.    After these detectives finished questioning Plaintiff, they handcuffed his wrist to a ring on the wall and left the room.

22.    After some time had passed and Plaintiff fell asleep, Defendant James Pienta entered the interview room, stepped on Plaintiff's foot, slapped him in the face, said "wake up nigger," and slapped him again.

23.    Defendant Pienta handcuffed both of Plaintiff's hands to the ring on the wall and told him that the statement he gave to detectives Duffy and Dwyer was "bullshit," and that they

had his girlfriend, Tanya Crawford, at the police station.

24.     Defendant Pienta attempted to compel Plaintiff to implicate himself in the Williams homicide, and when Plaintiff refused to do so, Pienta slapped him in the face. Pienta continued to coerce Plaintiff so that he would implicate himself in the murder, and each time Plaintiff denied involvement, Pienta slapped him.

25.     At one point, Plaintiff moved into the fetal position to deflect the slaps and Defendant Pienta, noticing a scratch on Plaintiff's leg, stepped on Plaintiff's foot, took out a set of keys, and scraped the keys across the pre-existing scratch on Plaintiff's leg.

26.     As Pienta scraped his leg with the key he said, "Shut up, nigger, you're going to cooperate, you're going to listen," or words to that effect.

27.     Pienta repeatedly scraped the key across Plaintiff's leg which caused Plaintiff to yell out in pain.

28.     Plaintiff eventually agreed to cooperate because he could not take the pain any longer and he made a statement to Pienta falsely implicating himself in the murder.

29.     Defendant Marley was present at Area 2 while Plaintiff was being interrogated by Defendant Pienta, and was aware that Plaintiff was being subjected to torture and abuse by Defendant Pienta, yet failed to intervene to prevent said torture and abuse despite having the duty and opportunity to do so.

30.     After Plaintiff agreed to cooperate, Pienta went over the statement that he wanted Plaintiff to recite with him, and when Plaintiff forgot something that Pienta told him to say, Pienta slapped him and scraped his leg with the key.

7

31.     After Plaintiff recited the false inculpatory story, Defendant Pienta left the room, then returned with a soda and a bag of chips.

32.     Defendant Pienta then went over the statement again with Plaintiff, and when Plaintiff got confused about what he was supposed to say, Pienta "muffled" him in the face.

33.     Eventually, after Plaintiff was able to recite the false inculpatory statement to Pienta's satisfaction, Defendant Pienta took him out of the interview room to another room in which Plaintiff was able to see his girlfriend Tanya Crawford through a two way mirror.

34.     Pienta then took Plaintiff to another room, where an Assistant State's Attorney, Defendant Marley and a court reporter were waiting, and Plaintiff went over the statement with the Assistant State's Attorney, falsely implicating himself in the Williams murder.

35.     On the basis of Plaintiff's false inculpatory statement that was fed to him by Defendant Pienta, Plaintiff was subsequently charged with the attempted armed robbery and murder and of Billy Williams.

**Plaintiff's Suppression Hearing and Trial**

36.     In July 1991, the trial judge conducted a hearing on Plaintiff's motion to suppress statements.

37.     At that hearing, Pienta testified, falsely denying he had abused or threatened Plaintiff in any way.  Pienta was never confronted with other acts of similar abuse that he had previously participated in while working at Area 2 Violent Crimes Unit, nor with the implements of his torture, including the set of keys that he used to scrape Plaintiff's leg wound.

38.     No evidence or findings of systemic Area 2 torture and abuse was available to, or

offered by, Plaintiff because this evidence had been suppressed and covered up by the Defendants and other unsued co-conspirators.

39.     Plaintiff also testified at the hearing, explaining in detail how he was tortured by Pienta until he agreed to repeat the false confession that Pienta fed to him.

40.     Plaintiff's torture and abuse was corroborated by witnesses who heard him screaming, observed his freshly opened leg wound, and were parties to his contemporaneous outcry.

41.     At the conclusion of the evidence, the trial judge denied Plaintiff's motion to suppress, accepting Defendants Pienta's false and perjured testimony and rejecting Plaintiff's testimony.

42.     At one of his pre-trial court dates, the State made its intention to seek the death penalty against Plaintiff clear on the record, and the trial court refused to rule out the possibility of sentencing Plaintiff to death if he were to be found guilty at trial.

43.     Because his false, coerced and fabricated confession stood as the central piece of evidence against him, and he feared that he would be sentenced to death if found guilty at trial, Plaintiff pled guilty to the Williams murder.

44.     After entry of the guilty plea, Plaintiff reasserted his innocence to the Court, stating:  "[t]he thing I have to say is for the reason I'm taking this plea is for the simple fact that I didn't do it.  I have to say I didn't do it…. I didn't do it."

45.     In light of Plaintiff's statement, the trial court, saying that Plaintiff's protestation of innocence after entering his guilty plea was unprecedented in his experience, refused to accept

the plea and set the case for 2:00 p.m. that same afternoon for the start of a jury trial.

46.     After a brief recess, Plaintiff's lawyer argued vehemently that Plaintiff should be allowed to make a plea of guilty under *North Carolina v. Alford*, 400 U.S. 25 (1970) without admitting his guilt.

47.     The trial court rejected Plaintiff's counsel's argument and decreed that if Plaintiff was claiming he was innocent, he would have a trial that day.

48.     In the face of an impending death penalty trial where his tortured confession would be the central piece of evidence against him, Plaintiff, on the advice of counsel, re-entered his guilty plea and the trial court sentenced him to 60 years on the murder charge and 15 years on the attempt armed robbery charge to run concurrently. The principal and determinative evidence connecting Plaintiff to the crime was his false, manufactured, fabricated and coerced confession.

49.     Plaintiff's false confession, which was coerced, constructed, manufactured, and fabricated by Defendant Pienta, was memorialized in false official reports, and presented to prosecuting attorneys who relied upon and presented this false, coerced, manufactured, and fabricated evidence in support of Plaintiff's prosecution.

50.     Defendants Pienta and Marley also suppressed from the prosecutors who prosecuted Plaintiff, from the judge who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's post-conviction petitions, that the admissions they attributed to Plaintiff were false and  totally unreliable, coerced through torture, constructed and manufactured by them, and were a product of a pattern and practice of torture and abuse in which they participated; additionally they suppressed, committed perjury about, altered,  and destroyed

the physical implements of this pattern and practice of torture, including the set of keys used against Plaintiff, as well as the cattle prods, electric shock box, plastic bags, typewriter covers, blackjacks, telephone books, shotguns, rubber truncheons, and handguns used by them against numerous other victims of their pattern and practice of torture.

### The Conspiracy to Torture and Abuse Suspects at Area 2 and Area 3 Police Headquarters and to Conceal and Cover Up the Torture and Abuse

51.     Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct. Rather, the interrogation and torture of Plaintiff in pursuit of a confession was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, baggings, mock executions and Russian roulette, suspensions, telephone bookings, and beatings committed, often with the use of racial epithets, against almost exclusively African American men under the supervision, and with the encouragement, participation and ratification of Area 2 Violent Crimes Lieutenant and his supervisory successors.

52.     Because Jon Burge, first as Pienta's fellow detective, and later as his supervising sergeant and commanding lieutenant, for the better part of 14 years, condoned and directly participated in acts of torture and physical abuse of suspects, detectives under his supervision and command -- Pienta among them -- came to believe that they could torture and physically abuse suspects with impunity.  Since torture and physical abuse often produced confessions, closed cases, and were rewarded with promotions, it was expedient for these officers to engage in these forms of horrific abuse.  These detectives continued the torture and abuse of suspects in order to gain confessions long after Burge left Area 2.

11

53.     The earliest known cases of torture in this pattern occurred in or about August of 1972, when Jon Burge, then a detective on the Area 2 midnight shift and his associates, brutally beat African American suspects Rodney Mastin, Lindsey Smith, and Phillip Moore, and in May of 1973 when Burge, with the assistance of Defendant Pienta, tortured Anthony Holmes, using an electric shock box, suffocation with a bag, beating and racial epithets.

54.     The Chicago Police Department took no action to punish or restrain Burge or Pienta at that time.  Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, George Powell, Tony Thompson, Timothy Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

55.     In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers.  In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African-American citizens, including Donald White, Anthony Williams, Lamont White, Walter White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African-American citizens.

**Richard M. Daley, Jane Byrne, Richard Brzeczek and Richard Devine**

56.     In the early morning hours of February 14, 1982, Burge and numerous Area 2 detectives, including Defendant Pienta, arrested Andrew Wilson for the police officer murders. That morning and throughout that day, Burge, Defendant Pienta and other Area 2 detectives

tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears, and other parts of the body with a black electric shock box and a plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating. States Attorney Daley, the then Mayor of the City of Chicago Jane Byrne, and the then Superintendent of the Chicago Police Department all closely monitored developments in the manhunt. All three learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and his brother Jackie Wilson, and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

57.     As a direct and proximate result of the failure of Daley, Leroy Martin and their successors to intervene, to discipline and to adequately supervise, Burge, Byrne, Pienta and other Area 2 Detectives tortured numerous additional almost exclusively African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to April of 1990. The victims in this period included the following men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Bobby Joe Williams, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Lee Norah, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Dwight Cavin,  Alphonso Pinex, Thomas Craft, Lavert Jones, Alex Moore, Terry Harris, Lonza Holmes, Mearon Diggins, Michael Tillman, Stephen Bell, Eric Caine, Aaron Patterson, Darrell Cleveland, Terrence Houston, David Randle, Richard Terrell, Andrew Maxwell, Jerry Thompson, Donald

Torrence, Madison Hobley, Jeffrey Howard, Curtis Milsap, and Ricardo Rodriguez.

58.     Defendant Pienta also suppressed from Plaintiff and his counsel, the trial, appellate and post-conviction prosecutors, and the judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men. Pienta also suppressed the physical implements of the pattern and practice of torture, including the set of keys used against Plaintiff, and the cattle prods, electric shock box, plug-in electrical device, plastic bags, typewriter covers, blackjacks, rubber truncheons telephone books, shotguns, and handguns used by Burge, Pienta and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

59.     By no later than February 1982, co-conspirator Daley had direct, personal knowledge that Defendant Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2.  During the February 1982 manhunt described above, Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2.  Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of the White brothers and Anthony Williams, who were placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated against them.

60.     Co-conspirator Richard M.  Daley was also informed of the arrests of Andrew and Jackie Wilson on the morning of February 14, 1982.  Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high ranking

Assistant State's Attorneys were present at Area 2. An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Burge and his men. The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that the Wilsons were being tortured. Those high ranking assistants were reporting directly to Daley and to the First Assistant State's Attorney at the time, Richard Devine. Neither Daley nor any of his top assistants did anything to halt or prevent the torture of the Wilsons.

61.    On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that the medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, and that Wilson reported being tortured with electric shock. In this letter, Dr Raba demanded an investigation. After conferring with high ranking police command personnel, the Superintendent wrote a letter to co-conspirator Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson, the Superintendent would not investigate or otherwise pursue the matter without instructions from Daley.

62.    Co-conspirator Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant and other high level subordinates. Daley never responded to the letter.

63.    Daley and his subordinates were fully aware that Superintendent Brzeczek's letter

15

set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman might be complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported the claim of physical abuse. Not only did Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through Cook County Board President George Dunne, that Raba "should not get involved" in the *Wilson* case, and subsequently, both Daley and the Superintendent issued separate public commendations to Burge and his men.

64. As a direct result of co-conspirator Daley's refusal to act, the Chicago Police Department, and its Office of Professional Standards indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by the other African American citizens who were tortured and abused during the manhunt.

65. Throughout the manhunt, the arrests first of the White brothers then of the Wilson brothers, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

66. This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Daley, no longer exists, and, on further information and belief,

16

was destroyed by Daley.

67.     In the period of time between the Wilsons' torture, in February 1982, and when Daley left the  Cook County State's Attorney's Office in December of 1988, Cook County prosecutors, under Daley's direction, prosecuted at least thirty African American men who were tortured by Defendants Pienta and Marley and co-conspirators Burge, Byrne, and other detectives under Burge and Byrne's command and supervision.  In none of these cases did Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Andrew Wilson and the specific knowledge of Daley and his high ranking subordinates as to the truth of Wilson's allegations.  In none of these cases did Daley request or pursue an investigation into the allegations of torture.

68.     Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the Cook County State's Attorney's Office prosecuted during this period of time.  There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant.  Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high command and the line assistants handling the prosecution.

69.     Subsequent to seeking and obtaining the death penalty in Andrew Wilson's case, Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey, Jerry Mahaffey, Michael Tillman, and Steven Bell,—all of whom claimed that they were tortured by Area 2 Lieutenant

Burge, Midnight Sergeant John Byrne, Defendants Pienta and Marley, and/or other Area 2 personnel. On information and belief, Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, Byrne, Pienta and/or other Area 2 personnel, in some cases using techniques identical or very similar to those Daley knew had been used against Andrew Wilson. Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

70.     At the time Daley reviewed the cases set forth in paragraph 69 above and decided to seek the death penalty in each of those cases he (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b) had personal knowledge that Burge and his Area 2 detectives were allegedly continuing to practice extreme physical abuse and torture against African American suspects; and (c) personally knew of exculpatory information regarding the pattern of torture, which he had deliberately suppressed since February 1982. Daley nonetheless decided to seek the ultimate punishment against these African American men without pursuing any investigation of their allegations and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

**Leroy Martin**

71.    Leroy Martin was the Commander of Area 2 in 1983 and early 1984, and was
Burge's direct supervisor.  At that time, Martin learned that his Violent Crimes Lieutenant Jon
Burge, his Midnight Sergeant John Byrne, and detectives under their command, including
Defendant Pienta, systematically tortured and abused numerous African American suspects,
including Andrew and Jackie Wilson, Eric Smith, Alonzo Smith, James Andrews, Jerry
Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and
Leonard Hinton. Martin failed to initiate appropriate investigations or to discipline Burge, Byrne,
Pienta, or any other Area 2 officers in connection with any of these cases.

72.    In 1987, Martin was named Superintendent of the Chicago Police Department.
As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2
Commander, Martin continued to fail to intervene, to supervise, discipline or otherwise act to
prevent the ongoing misconduct of Burge and his men.  Following Plaintiff's torture and
wrongful conviction, Martin worked actively to conceal and suppress evidence of the pattern of
torture, as is fully alleged below.

**The Actions and Inactions of Daley, Martin, Hillard, Needham and Shines to Conceal and
Cover Up the Pattern of Torture under Burge Frustrated Plaintiff's Efforts to Exonerate
Himself and Prolonged Plaintiff's Unjust Incarceration**

73.    Following his conviction in 1991, Plaintiff languished in prison until 2015, when
he was exonerated.

74.    Plaintiff's wrongful prosecution was continued, his exoneration was delayed and
his imprisonment and wrongful conviction lasted far longer than it otherwise would have

because, for many years, Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including Defendant Pienta and co-conspirators Burge, Byrne, their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

75.     In 1989, co-conspirator Daley became the Mayor of the City of Chicago.  In that capacity he was directly responsible for the appointment of the Superintendent of the Chicago Police Department.  Daley also had ultimate responsibility for the operations of the Police Department.  Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to all victims of co-conspirators Burge, Byrne, and their Area 2 confederates, including Defendant Pienta.  In addition, Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Daley had become personally aware while he was State's Attorney of Cook County.

76.     Co-conspirator Daley, while Mayor 1) did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until he left the Mayor's office in 2011; 2) did not intervene at any time to direct the Chicago Police Department to disclose exculpatory information in its possession regarding Burge; and 3) did not direct the CPD to conduct a thorough and aggressive investigation of Burge, Byrne, Pienta, and the other detectives who abused African American men while working under Burge's command.

77.     Rather than disclose exculpatory material and conduct appropriate investigations,

co-conspirators Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged above and below.

78.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. In 1991, the Goldston Report was supplemented with a finding that Burge, Byrne, and several other Area 2 detectives were prime movers in this pattern of abuse, and that Burge and two of his subordinates had tortured Andrew Wilson. In a companion Report (the "Sanders Report") the OPS found that Burge and these same two subordinates tortured Andrew Wilson and recommended that they be fired.

79.     Co-conspirator Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

80.     Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that there was systematic abuse at Area 2,

21

which implicated Martin, Burge, Byrne, and other Area 2 detectives who worked under Burge's command.

81.     The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

82.     On or before February 7, 1992, Mayor Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.  Daley knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

83.     Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Daley: 1) did not seek an independent federal investigation; 2) direct Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or 3) seek the prosecution of Burge and his confederates.

84.     Instead, in a joint effort with Superintendent Martin, Mayor Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was, *inter alia*, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

85.     Even after learning of the findings in the Goldston Report, Martin, OPS Director Gayle Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

86.     From 1989 to 1992, Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

87.     In January of 1992, Martin admitted in a publicly filed pleading that an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

88.     In February 1993, the Chicago Police Board fired Burge for torturing Andrew Wilson.  These findings became final in December 1995.

89.     In 1993, the OPS re-opened investigations into approximately ten Area 2 torture cases.  After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that Sergeant Byrne and Area 2 Detective Peter Dignan racially abused and tortured Darrell Cannon with the cattle prod.  OPS supervisor Carmen Christia reviewed the findings and approved them.

90.     The OPS also entered sustained findings of torture and abuse against Byrne and Dignan in five other re-opened cases, including that of Gregory Banks and Stanley Howard.

91.     From 1993 until 1998, co-conspirator Shines (who had previously been appointed by Mayor Daley) under pressure from her fellow co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

92.     In 1998, co-conspirator Superintendent Terry Hillard and his administrative assistant Thomas Needham, with full knowledge that Area 2 detectives had participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate OPS Director Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

93.     On information and belief, Daley also personally insisted, from the time he became Mayor in 1989 until he was succeeded in 2011, that the City of Chicago continue to finance the defense of Burge, Byrne, Defendant Pienta and their accused colleagues and subordinates, despite his personal knowledge that they had committed acts of torture against African American men while employed as Chicago Police officers and/or supervised and condoned such acts.  Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and continued throughout Daley's tenure as Mayor, despite Burge's indictment in October of 2008 for perjury and obstruction of justice, and his conviction on these charges on June 28, 2010.

**Plaintiff's Exoneration**

94.     The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

95.     On June 13, 2012, the Illinois Torture Inquiry and Relief Commission (TIRC) issued a Disposition on Plaintiff's TIRC claim, finding that "by a preponderance of the evidence, there is sufficient evidence of torture to conclude the Claim is credible and merits judicial review for appropriate relief."

96.     The TIRC, an administrative agency empowered by state law to investigate, make official findings, and refer cases to Court for judicial review, entered the following findings concerning Plaintiff's case:

- "During the course of this questioning, [Whirl] was repeatedly slapped and beaten by Pienta in order to secure a confession from [Whirl]."

- "After [Whirl] agreed to make a statement, Pienta rehearsed with [Whirl] what [Whirl] would say when the Assistant State's Attorney (ASA) arrived. Every time [Whirl] made a mistake in repeating what Pienta told him, Pienta used a key to dig into a pre-existing leg wound which [Whirl] had sustained in an attack by three gang members several days earlier."

- "At his motion to suppress, [Whirl] presented evidence that Pienta used a key to scrape and cut his leg. This evidence included witness testimony and photographs showing that his leg wound was fresh and raw after his questioning by Pienta."

- "Without the confession, the prosecution's case against [Whirl] is weak. There were no eyewitnesses who identified [Whirl] as the perpetrator. The murder weapon was not recovered. There was no forensic evidence connecting [Whirl] to the offense, other than a fingerprint from the front passenger side door of the victim's cab."

- Whirl "had no prior criminal history" and the motive for the robbery presented by the State was "anomalous."

- "Faced with the possibility of receiving the death penalty, and with his motion to suppress having been denied, [Whirl] entered a guilty plea to the homicide charge in return for the prosecution waiving its request for the death penalty."

- The confession "was the principal evidence introduced by the prosecution to support the guilty plea."

- "During the entry of the guilty plea [Whirl] stated that he did not commit the crime, and was only pleading guilty because of the possibility that he would receive the death penalty if convicted at trial."

97.    The TIRC also made the following findings and conclusions relevant to the nearly two decades long pattern and practice of torture which Burge supervised and in which Burge, Pienta, Byrne, and numerous other Area 2 detectives and supervisors jointly participated:

- Pienta was Burge's longtime subordinate before Burge was moved from Area 2 to Area 3.

- Pienta worked under Burge since the 1970s, and "has an extensive history of accusations of physical abuse…" including accusations of abuse which are "remarkably similar" to Whirl's allegations.

- Detective Pienta has been identified in other torture allegations, some of which are "strikingly similar" to Whirl's allegations; and

- Whirl's claim "is consistent with the office of Professional Standards' findings of systemic and methodical torture at Area 2 under Jon Burge."

98.    Plaintiff subsequently filed a combined petition under the Post-Conviction Hearing Act and the Illinois Torture Inquiry and Relief Commission Act, which documented in detail the longstanding pattern and practice of torture and abuse at Area 2, including other acts of torture by Pienta.

26

99.     Plaintiff's combined petition was denied after an evidentiary hearing, and he appealed.

100.     On August 12, 2015, the Illinois Appellate Court vacated Plaintiff's conviction and held that Plaintiff was entitled to a new motion to suppress hearing on the question of whether his confession was tortured from him and should consequently be barred from evidence at a new trial.

101.     The Appellate Court found, *inter alia*, that "it is impossible to conceive how the State could prevail at a new suppression hearing," and that "without Whirl's confession, the State's case was non-existent."

102.     On October 13, 2015, the prosecution dismissed all charges against Plaintiff in a manner indicative of innocence, and on October 14, 2015, he was released from prison.

**The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy**

103.     Defendants Pienta and Marley, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, including those specifically named as co-conspirators in this complaint, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.  This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, and has continued to the present, as evidenced, *inter alia*, by the false testimony and statements denying torture given by these Defendants and their fellow officers; false statements and testimony Burge, co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's

27

attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v Burge*; and by false public statements concerning police torture made by, *inter alia*, co-conspirators Daley, Burge, Byrne and Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment,  in June and July of 2010 in response to Burge's conviction, and in 2015 in response to the passing by the Chicago City Council of the Reparations Ordinance.

104.     By and through the aforementioned overt acts, together with those set forth above, each and every defendant and co-conspirator jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived and continues to deprive Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement and imprisonment and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Plaintiff's Damages**

105.     Plaintiff spent 24 years in prison for a crime he did not commit.  This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff also suffered from the loss of sustained contact with his mother, father, and other members of his family, and was prevented from holding gainful employment or pursuing

educational opportunities outside the prison walls. He continues to live under the effects of his isolation, incarceration, and depression, and until his exoneration, under the stigma of his wrongful conviction. Additionally, Plaintiff suffered and continues to suffer, egregious pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse.

## COUNT I
### (42 U.S.C. § 1983 Claim for Deprivation of Fair Trial and for Wrongful Conviction)

106.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

107.    In the manner set forth more fully below, Defendants Pienta and Marley, individually, jointly, and in conspiracy with each other and the other named co-conspirators, caused the wrongful charging, prosecution, guilty plea, conviction, and imprisonment of Plaintiff and the continuation of that wrongful conviction.

108.    These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, guilty plea, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically coercing, constructing and/or fabricating the false and totally unreliable statements and admissions which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements and admissions were false, totally unreliable, constructed, fabricated and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and other evidence, including, but not limited to, other acts of torture and abuse that they participated in, the instruments of torture, as well as other exculpatory evidence; by giving a false and incomplete

version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the U.S. Constitution.

109.   Additionally and/or alternatively, Defendants Pienta and Marley failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.

110.   The actions of Defendants Pienta and Marley in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

111. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff demands judgment against Defendants Pienta and Marley for substantial compensatory and punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT II
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

112.   Plaintiff re-alleges all of the paragraphs set forth in this complaint.

30

113.    The actions of Defendants Pienta and Marley, individually, jointly, and in conspiracy with each other and with unsued co-conspirator Jon Burge, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during said interrogations, resulted in false, coerced, and fabricated admissions that were subsequently used against him in his criminal proceedings, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

114. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

115.    The actions of Defendants Pienta and Marley and co-conspirator Burge, in using torture and other coercive techniques to interrogate Plaintiff, and/or in devising, encouraging, facilitating, condoning and permitting the use of said techniques, and failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Pienta and Marley for substantial compensatory and punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

116.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

117.    Defendants Pienta and Marley, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command

personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

118.     Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

119.     Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

120.     Additionally or alternatively, Defendant Marley, knowing that the above § 1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands compensatory and punitive damages, jointly and severally, from Defendants Pienta and Marley, plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just,

**COUNT IV**
**(42 U.S.C. § 1983 *Monell* Policy Claim Against the City of Chicago)**

121.     Plaintiff re-alleges all of the paragraphs set forth in this complaint.

122.     The actions of Defendants Pienta and Marley as alleged above were committed pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

123.     At all times material to this complaint, the Defendant City of Chicago through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or Corporation Counsel's Office had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

    a.    conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Leroy Martin, Jon Burge and John Byrne at Area 2;

    b.    manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements and identifications;

    c.    the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 detectives;

    d.    the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

    e.    the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train,

supervise, discipline, transfer, monitor, counsel and/or otherwise control includes the "repeater" Defendant James Pienta as well as all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f.     the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal and civil cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques at Area 2 were employed. An egregious example of this code of silence in the torture cases is evidenced and was invoked in response to the Government's investigation and prosecution of Jon Burge and the investigation of other Area 2 officers under his command and supervision;

g.     covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance the defense of Jon Burge, Defendant Pienta, and other Area 2 detectives and otherwise attempting to both publicly and judicially defend their actions even after Burge had been indicted and convicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2.

124.    The pattern and practice of torture and abuse at Area 2, the cover-up of

that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well

known within Area 2 well before Plaintiff was tortured and wrongfully convicted, including by

the command officers at Area 2, which included Jon Burge and Leroy Martin, and Burge's

successor, Phil Cline, as well as to former Chicago Mayors Jane Byrne and Richard M. Daley

and their Chiefs of Staff, successive Police Superintendents, including Richard Brzeczek, Fred

Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline, to the successive OPS

Directors, including Gayle Shines, and Callie Baird, to various Command Personnel, including

Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, to the Chiefs of Detectives,

including William Hanhardt and Terry Hillard, to the Chicago City Council and the Chicago

Police Board, and to other policy making, command, and supervisory City and police personnel,

who participated in the cover-up and suppression of evidence, the wrongful prosecution and

conviction of the Plaintiff and other torture victims, and the denial of their full and fair access to

the courts, *inter alia*, in the manner set forth in this complaint.

125.    Said interrelated policies, practices and customs, as set forth above, both

individually and together, were maintained and implemented with deliberate indifference; they

encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, by

torture and related abusive tactics and techniques, the construction and fabrication of

confessions, admissions, statements, and other false witness evidence, the suppression and

destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses,

the making of false statements and reports, the giving of false testimony, the obstruction of

justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and

continuation of wrongful convictions and false arrests and imprisonments; and were, separately

and together, a  moving force behind, and a direct and proximate cause of, the unconstitutional

acts and perjury committed by the named Defendants and their co-conspirators, and the injuries

suffered by the Plaintiff.

126.    Additionally, the City of Chicago's said failure to properly train, discipline,

monitor, control, assign, transfer, supervise, and counsel Defendant Pienta, who was involved in numerous other acts of torture and abuse, including Anthony Holmes, Andrew Wilson, Mearon Diggins, Aaron Patterson, Eric Caine, Terrance Houston, and Darrell Cleveland, was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

127.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental and police policymakers, acting in their official capacities, as set forth in detail in the facts above, including, but not limited to, successive Police Superintendents, including co-conspirators Leroy Martin and Terry Hillard, and their direct subordinates, including, but not limited to, Gayle Shines and Thomas Needham, and several Mayors, most notably Mayor Richard M. Daley, who continued to publicly both ratify, and deny his involvement in, said conduct until he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V
### (State Law Claim for Malicious Prosecution)

128.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

129.    Defendants Pienta and Marley individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants,

individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor and in a manner indicative of innocence. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Pienta and Marley*,* and punitive damages, the costs of this action, and such other and additional relief as this Court deems equitable and just.

## COUNT VI
### (State Law Claim for Intentional Infliction of Emotional Distress)

130. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

131. Defendants Pienta and Marley individually, jointly, and in conspiracy, by, *inter alia*, torturing false admissions from Plaintiff and/or by failing to prevent or stop said torture, by constructing and fabricating admissions, and by procuring his prosecution, conviction, and imprisonment for a murder he did not commit by means of said false admissions, engaged in extreme and outrageous conduct. Additionally these same Defendants, individually, jointly, and in conspiracy with their named co-conspirators, *inter alia*, by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, and by making false public statements, engaged in additional extreme and outrageous conduct.

132. Defendants Pienta and Marley intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

133.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was, and continues to be, injured, and has, and continues to, experience severe emotional distress, including nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiff demands judgment against Defendants Pienta and Marley for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VII
## (State Claim for Conspiracy)

134.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

135.    Defendants Pienta and Marley, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in, and continue to engage in, a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and/or continue said prosecution, and to intentionally inflict continuing severe emotional distress on Plaintiff.

136.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

137.    Said conspirac(ies) and overt acts were, and are, continuing in nature.

138.    Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute, and intentionally

inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Pienta and Marley, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VIII
### (State Law *Respondeat Superior* Claim)

139.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

140.    Defendants Pienta and Marley were, at all times material to this complaint, employees of the Defendant City of Chicago, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims against the Defendants Pienta and Marley, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Chicago)

141.    Plaintiff re-alleges all of the paragraphs set forth in this complaint.

142.    Defendant City of Chicago was the employer of Defendants Pienta and Marley at all times relevant and material to this complaint.

143.    These Defendants committed the acts alleged above under color of law and

in the scope of their employment as employees of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Dated: February 24, 2016          Respectfully submitted,

Jon Loevy, Tara Thompson        /s/ G. Flint Taylor
LOEVY & LOEVY              One of Shawn Whirl's Attorneys
312 N. May Street, Ste. 100        G. Flint Taylor, Ben H. Elson
Chicago, Illinois  60607           PEOPLE'S LAW OFFICE
(312) 243-5900                 1180 N. Milwaukee Ave
                              Chicago, IL. 60642
                              (773) 235-0070

**Plaintiff demands trial by jury on all counts.**